UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AARON MITCHELL, # 237440,

        Petitioner,         Case Number: 08-CV-14098

v.         Honorable Arthur J. Tarnow

RAYMOND BOOKER,

        Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

### I.  INTRODUCTION

This is a habeas case filed by a state prisoner under 28 U.S.C. § 2254.  Petitioner Aaron Mitchell is a state inmate in custody with the Michigan Department of Corrections, pursuant to jury convictions for two counts of receiving and concealing stolen property over $20,000, two counts of conspiracy to commit larceny by false personation, one count of conspiracy to commit identity theft, and two counts of possession of stolen or counterfeit insurance certificates.  He was sentenced to concurrent prison terms of thirty-four months to twenty years for the receiving-and-concealing convictions and seventeen months to ten years for the remaining convictions.  Petitioner was paroled on February 3, 2009.  Pursuant to the Michigan Department of Corrections Offender Tracking Information website, Petitioner's supervision discharge date was August 3, 2011.  To date, Petitioner remains on parole and has not been discharged from his sentences.

On September 24, 2008, Petitioner filed this *pro se* Habeas Petition, raising claims concerning violations of the Confrontation Clause, trial court error in the admission of prior bad

acts evidence, a denial of his right to present a defense, and the effectiveness of trial and appellate counsel. For the reasons stated, the Court will deny the Petition. The Court also will decline to issue Petitioner a Certificate of Appealability.

## II. BACKGROUND

### A. Substantive Facts

Petitioner's troubles in this case arose because of incidents that occurred in March 2005. The prosecution's theory was that Petitioner was actively involved in a scheme to steal the identity of a client of the insurance agency where he was formerly employed and use that client's name and credit history to finance the purchase of two expensive cars. The client, Homer Powell, was a retiree who had obtained his insurance, for thirty-seven years, from Allstate Insurance Company, where Petitioner was once employed. The photocopy of the driver's license Petitioner provided to finance the purchase of the cars in Powell's name contained Powell's name and address, but the photo of another man and a different date of birth. Powell did not know Petitioner, did not buy the cars, and had never been to the dealership where the cars were purchased. He learned that the cars had been purchased in his name in April 2005, when a bank sent him notices regarding the unpaid loans.

Trial in this case began on February 13, 2006, and concluded on February 15, 2006. Testimony revealed the following pertinent facts.

Nader Naamou, the owner of a small used car lot, testified that he was contacted by Bilial Ali in March 2005, about purchasing a car. Ali was an auto broker with whom Naamou had done business with in the past. On March 12, 2005, Petitioner came to Naamou's business, with Ali, in search of a Mercedes. Petitioner told Naamou that his "uncle," Homer Powell, was

looking for a car but could not come to the lot to fill out a credit application because he was disabled. He gave Naamou a photo copy of the forged driver's license and a copy of Powell's credit bureau report. He also provided Naamou with a phone number where he could reach his "uncle" and verify the information.

Naamou called the number and spoke to a man who claimed to be Powell. He then filled out a credit application for Powell.

Naamou did not have his own source for financing the purchase of cars. Rather, he had an arrangement with a larger used car dealership, Park Motor Sales, through which a buyer could obtain financing. Naamou would prepare the credit application for the buyer and sell the car to Park Motor Sales. Park Motor Sales would then complete the transaction by securing financing for the buyer and reselling the car. Park Motor Sales would receive approximately $800 for its efforts.

Naamou referred the sale of the Mercedes to Park Motor Sales. After the sale had been approved, Ali contacted Naamou about the purchase of a second car. Naamou then contacted Park Motors and learned that the purchase of a second car would not be a problem. He relayed that information to Ali, and Ali and Petitioner returned to buy another car, a Volvo.

Petitioner told Naamou that he would fax the required insurance information necessary to complete the transaction. He then faxed insurance certificate binders to Naamou. However, the binders, reflecting insurance issued by Titan Insurance Company, were forged. They contained actual policy numbers, but the numbers were for policies issued to someone other than Powell.

Naamou's contact at Park Motors was Frank Badalamente. Naamou told Badalamente that Powell and his nephew would be coming to Park Motors to purchase the car. On March 25,

3

2005, Petitioner arrived at Park Motors with an older man. Petitioner told Badalamente that he was there with his "uncle," that his uncle was buying the cars, and that he was just there to help him out. The used car manager for Park Motor Sales, Gary Ambro, saw Petitioner in the dealership that day, but he was not involved in the sale. Badalamente completed the transaction with the man who had identified himself as Powell.

At trial, Badalamente saw Powell. He testified that the man he met on March 25, 2005, was not Powell. Rather, the man had presented the driver's license that contained his photo, not that of the Powell. He said that, as Petitioner sat nearby, the man signed the paperwork and took the keys to the cars. Badalamente saw Petitioner drive away in one of the cars.

According to Naamou's testimony, Petitioner called him approximately one week after the sale. He said he was on vacation in New York and needed to change the address to which the bills or statements would be sent. Because Naamou was not familiar with the bank that financed the transaction, Naamou told Petitioner to call Park Motors.

Agent John Tiano of the Office of Inspector General was conducting surveillance in connection with an investigation involving counterfeit documents when he saw Petitioner driving both the Mercedes and the Volvo. He saw Petitioner driving the Mercedes on May 24, 2005, and on June 3, 2005, and the Volvo on September 9, 2005. On other occasions, he saw the cars driven from the house where Petitioner resided, but could not say positively that Petitioner was the driver.

On August 19, 2005, 1nvestigator Sidney Godley, from the Wayne County Sheriff's Department, found the Mercedes. The car was equipped with two tracking devices. According to the Mercedes Company, the first would allow one to know where the car was located at any

time. The second allowed the company to listen to conversations within the car. The former device, not the latter, had been disabled. Using information gleaned from conversations taking place in the car on that day, Investigator Godley tracked the car to a restaurant in Dearborn, Michigan. Investigator Godley saw Ali exit the restaurant and get inside the car. He then arrested him.

During a search of the car, Investigator Godley found Petitioner's résumé, an application for employment at Auto Zone containing information about Petitioner, and a Michelin tire book with Powell's name, address, and driver's license number written on it. The résumé indicated that Petitioner had been employed between 2000 and 2003 as an insurance agent at the agency where Powell purchased his insurance. The Auto Zone application also indicated that Petitioner was a licensed insurance agent.

On September 23, 2005, Agent Tiano arrested Petitioner on a federal warrant. Petitioner was the passenger in his ex-wife's car at the time of the arrest. A briefcase was between his legs. In the briefcase, Agent Tiano found an application for a Michigan vehicle title for the Mercedes that listed Petitioner as the owner and Powell as the seller. Petitioner told Agent Tiano "I have that in case I get pulled over by the police." Trial Tr. vol. II, 114 Feb. 14, 2006.

Agent Tiano contacted Investigator Godley, and Godley interviewed Petitioner at Tiano's office. Petitioner waived his rights and spoke to Godley, but declined to make a written statement. Petitioner told Investigator Godley that the Powell imposter was already at Park Motor Sales when he arrived. He said his job was to oversee the paperwork and make sure everything was being signed correctly. He said he drove the Mercedes off the lot and Ali's son

drove the Volvo. Petitioner told him that the imposter was a homeless drug addict who was paid about hundred dollars. He said he received $1,000 from Ali.

Petitioner admitted that he faxed the insurance documents to Naamou from a Kinko's in Dearborn. He accurately described the location of the insurance agency from which the policy allegedly originated. He said an older Arabic man gave him the documents, but did not want him to fax them from his place of business. He told Investigator Godley that he drove the Mercedes to New York City. He also said he

obtained a spare key to the Volvo and took the car from the parking lot of the school where Ali's son attended. He then subleased the car to a drug dealer.

The jury convicted Petitioner.

### B. Procedural Facts

Following his sentencing, Petitioner filed a direct appeal with the Michigan Court of Appeals, raising a claim concerning his Confrontation-Clause rights. Subsequently, through counsel, the following two additional claims were raised: (1) whether the trial court erred in the admission of prior bad acts evidence and (2) whether his rights to the compulsory process and to present a defense were violated. On December 6, 2007, the Court of Appeals affirmed his convictions and sentences. *People v. Mitchell*, No. 269141, 2007 WL 4270666 (Mich.Ct.App. Dec. 6, 2007).

Petitioner then filed an application for leave to appeal the Court of Appeals's decision with the Michigan Supreme Court, raising the same claims and adding claims concerning the effectiveness of trial and appellate counsel. The Supreme Court denied his application. *People v. Mitchell*, 480 Mich. 1188, 747 N.W.2d 282 (2008).

Petitioner neither filed a post-conviction motion with the state trial court nor a petition for writ of certiorari with the United States Supreme Court. Rather, he filed this Habeas Petition, raising the same claims raised in both state appellate courts.

### III. STANDARD OF REVIEW

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal-habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11.

Recently, in *Harrington v. Richter*, --- U.S. ---, 131 S.Ct. 770 (2011), the Untied States Supreme Court stated: "A state court's determination that a claim lacks merit precludes federal

habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, --- U.S. at ---, 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Court further stated:

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington*, --- U.S. at ---, 131 S.Ct. at 786-87 (internal citation omitted).

A federal habeas court must presume the correctness of state court factual determinations. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV. DISCUSSION

### A. No Confrontation-Clause Violation

Petitioner first contends that his right to confront the witnesses against him was violated when he was not allowed to cross-examine Investigator Godley regarding Godley's notes of his interview with him and whether those notes reflected the statements that he had made to him. As an initial matter, Respondent argues that this claim is procedurally defaulted; the Court of Appeals procedurally defaulted the claim by reviewing it for plain error because Petitioner did not make an offer of proof and the record did not indicate the substance of the evidence he sought to admit. In the alternative, Respondent argues that the claim lacks merit.

A procedural default is not a jurisdictional bar to review of the merits of an issue, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to

address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Here, the Court deems it more efficient to proceed directly to the merits of Petitioner's claim.

"[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, that the defendant might wish.'" *United States v. Owens*, 484 U.S. 554, 559 (1988) (citations omitted and emphasis in the original). "Trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, a witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

In this case, the trial court properly exercised its discretion in sustaining two of the People's objections during the cross-examination of Investigator Godley. Petitioner's questions about the Investigator's notes of his interview with him would not have elicited impeachment evidence. The questions involved are as follows: "So, essentially, according to your report and to what you–you told–you indicated in your notes, Aaron Mitchell's role was to witness a transaction?" and "Does your report or do your notes indicate that Aaron Mitchell admitted having anything to do with the identity–" Trial Tr. vol. II, 138-39 Feb 14, 2006.

In this case, defense counsel attempted to circumvent the requirement that the statements be offered against the party who made them by framing his questions in terms of whether Investigator Godley's notes of an interview with Petitioner reflected his statements. The trial

9

court recognized as much and correctly sustained the People's objections. The trial court, in explaining its ruling, stated, "Unless it's impeachment, it would be hearsay, unless you're offering it to impeach what the witness testified previously to. Then, you're offering your own client's out of court statement." Trial Tr. vol. II, 139 Feb 14, 2006.

Investigator Godley had testified that Petitioner told him that the Homer Powell imposter was already at Park Motor Sales when he arrived, that the imposter was a homeless drug addict, and that his job was to oversee the paperwork and make sure everything was being signed correctly. Moreover, Godley had already admitted, during cross-examination, that he did not write down every single thing.

To the extent that Petitioner's questions called for Godley's characterization of the substance of Petitioner's statements, the evidence would not have been admissible because the jurors already had a clear understanding of Godley's testimony and were fully capable of drawing their own conclusions from the evidence of Petitioner's statements. See M.R.E. 701 (which provides that the testimony of a lay witness in the form of inferences is limited to those inferences that are helpful to a clear understanding of the witness' testimony or the determination of a fact in issue); *Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2006) (quoting *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989) (where it is merely the extent of cross-examination that is limited, the trial judge retains a much wider latitude of discretion).

If defense counsel wanted to impeach the Investigator with his notes, he was free to question him about notations that were inconsistent with his trial testimony. Any effort to introduce Petitioner's out-of-court statements as substantive evidence was improper.

10

However, even if the trial court had erred in limiting defense counsel's cross-examination of the officer, such error was harmless. On habeas review, the proper harmless-error test is the one articulated in *Brecht v Abrahamson*, 507 U.S. 619 (1993). Under *Brecht*, a violation of a petitioner's Sixth Amendment rights requires reversal only if it had "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637; *Stoner v Sowders*, 997 F.2d 209, 213 (6th Cir. 1993) (quoting *Brecht*, 507 U.S. at 637). Here, the limitation of defense counsel's cross-examination of the officer did not likely have a substantial and injurious effect or influence in determining the jury's verdict, given the overwhelming evidence against Petitioner, as described above.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

### B. Admission of Prior Bad Acts Evidence Is Noncognizable

Petitioner next claims that the trial court abused its discretion in admitting evidence of prior convictions as impeachment against him; Petitioner's 1994 armed-robbery convictions.

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993). Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Clemmons v. Sowders*, 34 F.3d 352, 356 (6th Cir. 1994).

As to the admission of prior acts, the United States Supreme Court has declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990). Thus,

11

"[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, there is no Supreme Court precedent that the state-court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Id.* at 513; *see also Adams v. Smith*, 280 F.Supp.2d 704, 716 (E.D. Mich. 2003) (same). Petitioner's claim that the state trial court violated Michigan Rule of Evidence 404(b) by admitting the other acts evidence is not cognizable on habeas review. *See also Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (same).

Furthermore, even if Petitioner stated a cognizable claim in this regard, he is not entitled to relief. Petitioner has not shown that the disputed evidence rendered his trial fundamentally unfair. As explained by the Michigan Court of Appeals in reviewing this issue under state law, "the armed[-]robbery conviction was marginally probative on the issue of credibility, and while old, was not similar to the crimes for which defendant was being tried. Further, defendant testified and dealt with the issue well." *See Mitchell*, 2007 WL 4270666 at *2.

Such testimony was properly admitted under state law for those purposes. Petitioner has not shown that the admission of this evidence was erroneous or, more importantly, that it rendered his trial fundamentally unfair. Habeas relief is not warranted.

### C. Right to Present a Defense Not Violated

Petitioner next claims that the trial court intimidated his sole potential witness, his ex-wife Kimberly Mitchell, into not testifying, thereby depriving him of his right to present a defense. Ms. Mitchell was originally a co-defendant in the case. The Court of Appeals rejected

12

this claim on procedural grounds, finding that the claim was waived. However, for the reasons stated in section IV, A, *supra*, this Court will address the merits of this claim.

Federal law is clear on the right to present a defense. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). The Supreme Court gives trial court judges wide latitude to exclude certain evidence. *Id.* (quoting *Delaware*, 475 U.S. at 679).

The Court agrees with the Court of Appeals's decision. This issue was waived because Petitioner ultimately withdrew his request to call his ex-wife as a witness. During an exchange between the trial court and the attorney appointed for Petitioner's ex-wife, defense counsel stated, "Judge, defense is going to rest." Trial Tr. vol. II, 199 Feb. 14, 2006. In response to the court's inquiry whether counsel desired to call the witness, counsel stated, "I'm not going to call her." *Id.* The court then stated, "So defense is going to waive the–Miss Kimberly Mitchell as well as all remaining witnesses." *Id.* Counsel responded, "That's true, Judge." *Id.* By withdrawing his request, Petitioner waived any error.

Waiver is an "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (citations omitted). One who waives his [or her] rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error. *Id.* at 731. Forfeiture is "the failure to make the

13

timely assertion of a right" and, unlike waiver, forfeiture does not extinguish an error. *Id.* at 732. The court need not directly address the issue to the defendant, nor is defendant required to personally waive objection. The waiver must, however, arise out of voluntary affirmative conduct–it must be an intentional relinquishment or abandonment. The Court of Appeals properly determined that this claim was waived at trial. However, even if Petitioner had not waived the issue, no error occurred that would necessitate habeas relief.

Even if the trial court may have been mistaken about the possibility of the prosecution reinstating the dismissed charges against Petitioner's ex-wife, the trial court correctly informed her and her attorney that her testimony might lead to new charges and might affect her probation because anything she said could be used against her. Appointed counsel then met with the witness. While counsel disagreed with the court over the prosecution's ability to reinstate the dismissed charges, she correctly observed that the witness' testimony might affect the possibility of any appeal and would expose her to civil liability by effectively negating her no-contest plea. The trial court did not, as Petitioner asserts, intimidate the witness into not testifying. The trial court simply ensured that the witness had the benefit of counsel and an understanding of the ramifications of testifying before deciding whether to testify.

Although the witness never had to make that decision because Petitioner elected not to call her, she could have invoked her privilege against self-incrimination because the period for filing an application for leave to appeal from her conviction had yet to expire and her testimony may well have exposed her to other state and federal charges. Her decision to do so would not have infringed on Petitioner's right to present a defense because he has no right to compel a witness to waive her privilege against self-incrimination. *See Kastigar v. United States*, 406

14

U.S. 441, 444 (1972) (a defendant's right of confrontation and compulsory process under the Sixth Amendment is not violated when a witness invokes his or her right against self-incrimination under the Fifth Amendment); *see also*, e.g., *United States v. Blaylock*, 421 F.3d 758, 770 (8th Cir. 2005) (a defendant's Sixth Amendment right to compulsory process does not include the right to compel a witness to waive his or her Fifth Amendment privilege).

Against that backdrop, the Court concludes that Petitioner is not entitled to habeas relief regarding this claim.

### D. Appellate Counsel Not Ineffective

Petitioner next claims that he was deprived of his right to the effective assistance of appellate counsel by the actions or inactions of his first appellate counsel.

The right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 3 87, 396 (1985). To prevail on a claim of ineffective assistance of appellate counsel, Petitioner must demonstrate that appellate counsel's performance was deficient and that the deficient performance prejudiced the appeal. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Petitioner claims that his first appellate counsel did not interview him prior to filing his appellate brief and that the brief did not contain issues that he wanted to have raised on direct appeal. However, the record in this case indicates that, when Petitioner brought these complaints to the attention of appellate counsel, appellate counsel admitted his improper handling of Petitioner's case and filed a motion to withdraw, which was granted. New appointed appellate counsel then filed a motion to hold the appeal in abeyance so he could file a supplemental brief, which the Court of Appeals granted on May 10, 2007. A supplemental brief was filed, raising

two additional claims. Petitioner does not appear to be claiming that his second appellate counsel was ineffective.

Petitioner has not demonstrated how he was prejudiced by the ineffectiveness of his first appellate counsel. While he makes vague references to being "denied the opportunity to file post-trial motions," he does not detail how this prejudiced him. Therefore, he is not entitled to habeas relief regarding this claim.

### E. Trial Counsel Not Was Ineffective

Finally, Petitioner alleges that trial counsel was ineffective for failing to discuss trial strategy with him, for failing to request a hearing when he never confessed, and for failing to research and urge for the enforcement of legal protections for him as a result of an immunity agreement. Respondent argues that this claim is unexhausted. The Court agrees.

Generally, a federal district court should dismiss a "mixed" petition for writ of habeas corpus, that is, one containing both exhausted and unexhausted claims, "leaving the prisoner with the choice of returning to state court to exhaust his claims or amending and resubmitting the habeas petition to present only exhausted claims to the district court." *Rose v. Lundy*, 455 U.S. 509, 510 (1982). While the exhaustion requirement is strictly enforced, it is not a jurisdictional prerequisite for bringing a habeas petition. *See Granberry v. Greer*, 481 U.S. 129, 134-35 (1987). A habeas petition may be denied on the merits despite the failure to exhaust state-court remedies, if pursuit of a state court remedy would be futile, *see Witzke v. Withrow*, 702 F.Supp. 1338, 1348 (W.D. Mich. 1988), or if the unexhausted claim is meritless such that addressing it would be efficient and not offend federal-state comity. 28 U.S.C. § 2254(b)(2); *Prather v. Rees*,

822 F.2d 1418, 1422 (6th Cir. 1987). The Court concludes that the interests of justice are best served by ruling on the Petition because the claim lacks merit.

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough*, 540 U.S. at 5 (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), and *Strickland*, 466 U.S. at 687).

To establish deficient performance, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. To demonstrate that counsel's performance prejudiced the defense, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Unless a defendant makes both showings [deficient performance and resulting prejudice], it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Petitioner alleges the following against trial counsel: his meetings with trial counsel took place in the courthouse and lasted for about five minutes, he provided counsel with a list of witnesses, who were not questioned or called to testify, and he had not made a statement to the police and counsel failed to investigate that fact.

This Court's scrutiny of counsel's performance is highly deferential, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689-90; *accord Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). Petitioner attempts to rebut this presumption by arguing that counsel's trial strategy was not reasonable because he did not communicate properly with him. Because Petitioner did not move for an evidentiary hearing regarding his claim that counsel was allegedly ineffective,[1] it is difficult to discern from the record exactly how much time counsel spent with Petitioner. However, the Court finds that the record demonstrates that counsel vigorously defended Petitioner and met with him as needed. Counsel filed and argued various motions on Petitioner's behalf; for discovery, to quash information, to suppress statements, for a mistrial, to dismiss the case, and for a directed verdict. Counsel's failure to meet with Petitioner as much as he wanted does not make counsel's performance unreasonable under the facts of this case. There is no constitutionally prescribed minimum time that an attorney must meet with a client and discuss trial strategy. Further, even accepting Petitioner's allegations as true, he has failed to demonstrate how additional consultation with counsel would have changed the outcome of the trial.

Petitioner's remaining assertions of ineffectiveness are completely unsupported by the record in this case. As such, Petitioner has not even made a minimal showing of either deficient performance or prejudice in that the result of his trial would have been different under *Strickland*.

---

[1] Under Michigan law, to develop the factual basis of his ineffective assistance of counsel claim Petitioner was required to file a motion for a new trial and evidentiary hearing in the trial court or a motion to remand for that purpose in the Court of Appeals. *See People v. Ginther*, 390 Mich. 436, 443-44, 212 N.W.2d 922, 925 (1973); *People v. Gray*, 125 Mich.App. 482, 486, 336 N.W.2d 491, 493 (1983). Here, neither the Court of Appeals materials submitted by Respondent nor the trial court docket sheet reflects the filing of a motion for an evidentiary hearing on any claim.

Accordingly, the Court concludes that Petitioner is not entitled to habeas relief with respect to his ineffective-assistance-of-trial-counsel claim.

### F.  Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253.  Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must "issue or deny a [COA] when it enters a final order adverse to the applicant . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Rule 11, Rules Governing Section 2254 Proceedings.

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Courts must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed.R.App.P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).  To receive a COA, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted).

The Court finds that no reasonable jurist would debate about the Court's resolution of Petitioner's claims.  Therefore, the Court declines to issue Petitioner a COA with respect to all of his claims.

## V. CONCLUSION

**IT IS ORDERED** that the Petition for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED** that the Court declines to issue Petitioner a Certificate of Appealability.


                                          S/Arthur J. Tarnow
                                          Arthur J. Tarnow
                                          Senior United States District Judge

Dated: September 12, 2011

I hereby certify that a copy of the foregoing document was served upon parties/counsel of record on September 12, 2011, by electronic and/or ordinary mail.

                                          S/Catherine A. Pickles
                                          Judicial Secretary